IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SARAH W.,

        **Plaintiff,**

v.                                           **Civil Action 2:25–cv–00186**
                                                **Judge James L. Graham**
                                                **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Sarah W., brings this action under 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The Undersigned **RECOMMENDS** that the Court **SUSTAIN** Plaintiff's Statement of Errors (Doc. 8), **REVERSE** the Commissioner's non–disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

**I.    BACKGROUND**

Plaintiff filed her application for DIB on November 17, 2021, alleging disability beginning September 3, 2021, due to neuropathy, Raynaud's disease, "[tendons] in my feet are messed up," type 2 diabetic, high blood pressure, restless leg, foot spur, scoliosis, depression, anxiety. (R. at 393–99, 417). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephonic hearing on July 31, 2023. (R. at 180–204). Ultimately, the ALJ denied Plaintiff's applications. (R. at 157–79). The Appeals Council denied Plaintiff's request for review, making the ALJ's ruling the Commissioner's final decision. (R. at 1–7).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on February 27, 2025. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 7, 8, 10).

A.     **Relevant Hearing Testimony**

The ALJ summarized Plaintiff's testimony from the administrative hearing as follows:

> [Plaintiff] has continued to work for Door Dash three to four days per week, four hours per day from sometime in 2022 at least through the date of the hearing. She noted that hand and foot pain [prevent] her from working more than four hours per day. She alleged that her feet and hands are continually in pain and/or numb and these symptoms are worse when on her feet or using her hands. Prior to discussing her current work activity, [Plaintiff] testified that she drives three days a week and that her longest distance is twenty minutes (9:37–9:38 a.m.). As her later testimony confirms, her job involves multiple drives as she picks up food and delivers it to customers during her four–hour shift. She said that she sometimes has severe pain in her right hand and sometimes her feet fall asleep. Her alleged symptoms are inconsistent with her ability to work Door Dash three to four days a week for four[–]hour shifts since 2022. She testified as to needing a cane even in her own home. However, using a cane in one hand would prove challenging in carrying orders from the restaurant to her car and from her car to customers' homes, yet she did not describe receiving any assistance in doing her job.
>
> Considering the alleged extent of symptoms affecting her hands and feet, her ability to secure and maintain a job driving and delivering orders for Door Dash since 2022 seems inconsistent. [Plaintiff] also lives alone and can manage her activities of daily living with breaks per her testimony.
>
> Regarding her urinary retention disorder, [Plaintiff] testified that even following surgery in 2021, she continued to have a couple accidents per week due to urinary urgency. She also alleged that due to balance and/or knee issues, she uses a cane both inside and outside her apartment (9:57–9:58). [Plaintiff] indicated that Lyrica helps with her fibromyalgia; however, three to four times per week she alleged bad days in which she just wants to lay in bed. Regarding psychological limitations (borderline Intellectual Functioning, major depressive disorder; generalized anxiety disorder), [Plaintiff] alleged having a hard time focusing. [Plaintiff] said that she has a read hard time focusing and that her mind wanders while trying to watch a ninety–minute movie without interruption. She denied any difficulties getting along with others when doing her Door Dash job (9:52–9:53 a.m.).
>
> *** Prior to her Door Dash job, she had worked for an assistive living center. She testified that she cooked and assisted residents with dressing and using the toilet. The record reveals that she left this job because the facility closed (5F/3). She

worked up until her alleged onset date in September of 2021 and by 2022 she was working for Door Dash.

(R. at 167–68).

### B.     Relevant Medical Evidence

The ALJ discussed Plaintiff's medical records and symptoms related to her physical impairments as follows:

> *** a May 2021 nerve conduction studies and electromyogram revealed no lower extremity issues. Regarding the upper extremities, the record reveals only mild carpal tunnel syndrome on the left (2F/9). She has undergone a right–sided carpal tunnel syndrome release (2F), which was successful in light of the lack of continuing findings of carpal tunnel syndrome on the right. Subsequent primary care examinations from the alleged onset date in September of 2021 through the rest of 2021 and into 2022 consistently show no significant abnormality on examinations other than morbid obesity (3F/9, 12; 6F/6, 11). On September 1, 2021, [Plaintiff] reported doing well. She mentioned pain in her feet but also that she had not seen a podiatrist in two years (3F/8).
>
> In 2022, [Plaintiff] reported pain "all over" (7F/1); however, diagnostic imaging showed no abnormality (7F/7, 10, 13) and findings were normal other than a blood pressure of 132/90, a face rash, and obesity (7F/1–2). It was noted that her prior rheumatology workup had been normal (7F/1). On May 2, 2022, [Plaintiff] was in no acute distress, with normal heart, pulmonary, abdominal, musculoskeletal, and neurological and psychiatric findings (6F/6). Findings were the same in February of 2022 (6F/11). In records from late 2022 into 2023, primary care examinations continue to be pretty benign (9F/9, 12–13, 16–17, 21, 24).
>
> [Plaintiff]'s primary care physician diagnoses fibromyalgia, but this appears based on [Plaintiff]'s reports that her rheumatologist diagnosed her with fibromyalgia, as the primary care physician's exam findings do not support a medically determinable impairment of fibromyalgia (9F/16, 19). Rheumatology records, however, show that a 2018 evaluation was completely unremarkable (11F/6) and following a 2022 evaluation, the rheumatologist noted that will update workup for underlying rheumatologic process, though underlying suspicion is low and there is no indication of immunosuppression (11F/8). Further, the rheumatology exam shows subjective complaints of tender points and ankle/feet swelling but also that [Plaintiff] retained normal range of motion for the most part, 5/5 strength, and normal upper extremity exam with no effusions or synovitis (11F/7). *** There was little discussion of [Plaintiff]'s self–reported Raynaud's phenomenon without gangrene but conservative treatment with minimizing exposure to cold and stress suggested (11F).

3

> Records from 2023 also noted some complaints of knee pain; however, x–rays have showed only mild impairment (13F/7–9). [Plaintiff] was evaluated for her knee pain on May 9, 2023, alleging symptoms for years but admitting that she was last seen by an orthopedic doctor six years ago. At that time, she was diagnosed with patellofemoral pain and therapy was recommended. This physical therapy improved her symptoms. Thus, [Plaintiff] has managed her symptoms without doctor treatment for six years. As previously noted, her exams from her primary care physician were largely normal, with rare abnormality of the knees noted. Here, the exam revealed mild bilateral tenderness to the patella tendons and mild medical lateral joint line tenderness. She had symmetric knee range of motion to 120 degrees of flexion, negative McMurray's and intact sensation. She was ligamentously stable to varus valgus stress. She was diagnosed with bilateral knee mild osteoarthritis/patellofemoral pain. Conservative only treatment was recommended with oral anti–inflammatories, physical therapy, and steroid injection. She was to follow–up in three months to see how she is progressing. No follow–up is in the record. While [Plaintiff] alleged pain and numbness affecting her hands and feet, [Plaintiff] complained only of right thumb swelling on December 1, 2022. She denied numbness of tingling and the involvement of any other digits. Her imaging of the right thumb was completely normal (9F/30).
>
> As for her diabetes, her annual diabetic foot exam on March 2, 2023, was normal (9F/17). Primary care physician notes reveal assessments of type II diabetes mellitus without complication or use of insulin (9F). Her A1C was 6.3% on March 2, 2023, and 6.6% on May 24, 2023 (9F/3). There is no evidence of complications from this diabetes mellitus. She typically complained of myalgias and denied other symptoms (see, e.g., 9F/16–17).
>
> Regarding urinary issues, [Plaintiff] underwent a urethral sling procedure in May 2021 (12F/1). Subsequent records show significant improvement (see Ex. 12F) with [Plaintiff] eventually indicating that she was doing well, had no new complaints, and urinary frequency had improved to every four hours, nocturia only once per night, and in conflict with her subjective testimony, she denied urinary urgency. She had no side effects from her medication (12F/32).

(R. at 168–69).

The ALJ also discussed Plaintiff's medical records and symptoms related to her mental impairments as follows:

> Regarding mental limitations, records show a remote FSIQ score of 72 (1F). She also underwent a 2022 consultative exam, which showed some objective findings noting limitation but not to a debilitating degree (5F). The undersigned has accommodated those limitations with significant psychology restrictions in the mental residual functional capacity (5F). It is also noted that primary care examinations consistently do not reflect any significant psychological findings for

borderline intellectual functioning, major depressive disorder, and generalized anxiety disorder. Screenings were positive for depression at times, but [Plaintiff] also denied depression and substance abuse. Exams do not note any evidence of [Plaintiff] routinely presenting as depressed, anxious, or having cognitive difficulty in light of her borderline intellectual functioning (see, e.g., 9F/16). She had mild depression at this visit based on self–reported symptoms in screening, with a few other examinations showing a higher self–reported PHQ–9 score and greater depression (Id. at 18).

At the time of this psychological exam, [Plaintiff] might not have been working, but she later secures the Door Dash job and maintains this job (5F). In contrast, [Plaintiff] was noted to state that her most impactful behavioral health complaint is "The anxiety to go anywhere." Given her choice to work for Door Dash, which involves going to many new places and dealing with many new people, this main complaint might not have met durational requirements and in any event, causes less problems for her than reported to the psychological examiner. At the psychological examination, she alleged poor interpersonal functioning but at the hearing she reported no problems in her interactions with others on the job. She also denied difficulties with focus or concentration while working contrasts with her reports to the psychological examiner that her concentration has been poor (5F). Notably, the psychological examiner relies on these self–reports at least in part in supporting limitation in the functional assessment. For example, the psychological examiner wrote, "[Plaintiff]'s reported poor sense of self–efficacy adversely impacts her in this area. [Plaintiff]'s reported experiences of depressed and anxious moods both adversely impact her in this area. It seems that [Plaintiff] has an elevated risk for dysfunctions in carrying out instructions given to her in the workplace to completion." Similarly, the psychological examiner cites [Plaintiff]'s self–reported active avoidance of interpersonal relationships and her self–reported struggles managing herself when she must engage interpersonally, both adversely impacts her in this area (interacting with others).

Following this evaluation, [Plaintiff] seeks out a job involving interpersonal interaction with a multitude of new people. The psychological examiner's finding that [Plaintiff] would have an "elevated risk" for some type of dysfunction in all paragraph B areas is less persuasive in light of the reliance at least in part on [Plaintiff]'s self–reports and her later demonstrated success in a job involving understanding, memory, focus, persistence, concentration, interacting with others, and adapting and managing herself during stressful situations (driving to new places, getting order to customers in time, getting the right order to the right customer, and dealing with customer complaints). Diagnoses include major depressive disorder moderate and generalized anxiety disorder. This opinion is unpersuasive as not supported by rationale nor fully supported by Dr. Johnson's own, rather benign, objective findings. Further, the opinion provides no functional limitation and the actual limitations do not translate to a functional limitation that can be used in formulating an residual functional capacity Finally, to extent that these are debilitating limitations, the opinion is not consistent with the evidence of

5

>record, which shows that [Plaintiff] currently is able to work and showed no significant issues on primary care physician exams with some denials of any depression or anxiety and lack of complaints similar to those reported to the psychological examiner (5F).

(R. at 170–71).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2026. (R. at 162). And she had not engaged in substantial gainful activity since September 3, 2021, the alleged onset date. (*Id.*). The ALJ also determined that Plaintiff has the following severe impairments: Borderline Intellectual Functioning; Major depressive disorder; Generalized anxiety disorder; Urinary incontinence disorder significantly improved via urethral sling procedure as of May 2021; Bilateral carpal tunnel syndrome status post right–sided release; Obesity; Diabetes; Raynaud's Phenomenon; Bilateral feet/ankle bursitis/plantar fascia; Mild bilateral knee degenerative joint disease. (R. at 162–63). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment. (R. at 163).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

>[Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except occasionally stoop, kneel, crouch, and climb ramps and stairs; Never climb ladders, ropes, and scaffolds or crawl; Frequent handling and fingering with the bilateral upper extremities; No exposure to extreme cold, extreme heat, unprotected heights, or moving mechanical parts; No use of vibrating hand tools with the bilateral upper extremities; No commercial driving; Can understand, remember, and carry out instructions for simple, one to three step tasks; Frequent interaction with coworkers, supervisors; Occasional interaction with the general public; Can make simple work–related decisions; Can deal with occasional changes in a routine work setting explained in advance; No work that requires satisfaction of production quotas or involves assembly line pace; Off task 5% of the workday exclusive of normal breaks or lunch period.

(R. at 166).

6

The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record," and "with her actual reports to providers, her treatment history, and the objective evidence of record." (R. at 167).

The ALJ determined that Plaintiff is unable to perform her past relevant work as a cook, nurse aide, or warehouse worker. (R. at 173–74). Relying on the vocational expert's ("VE") testimony, the ALJ found that, considering her age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform at the sedentary exertional level, such as a sorter, labeler or sealer. (R. at 174–75). Consequently, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from September 3, 2021, through the date of this decision (20 CFR 404.1520(g))." (R. at 175).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538

7

(6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Though Plaintiff argues that the ALJ's opinion contains several errors, the Undersigned needs to address only one. Plaintiff says that the ALJ did not properly explain how he evaluated the limitations offered by state agency psychological consultants, Courtney Zeune, Psy.D., and Karla Delcour, Psy.D in crafting Plaintiff's RFC. (Doc. 8 at 17–20). Specifically, she claims the ALJ failed to explain why he deviated from the consultants' determination that Plaintiff could "interact superficially with coworkers in a setting with infrequent public contact." (R. at 260, 272). The Commissioner counters that the ALJ provided a thorough and well-supported analysis. (Doc. 10 at 3–10).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from [her] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). When determining the RFC, the ALJ must evaluate several factors, including medical evidence, medical opinions, and the plaintiff's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08–cv–2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). In doing so, the ALJ must resolve conflicts in the record. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). To that end, an ALJ "is only required to include in the residual functional capacity those limitations he finds credible and supported by the record." *Beckham v. Comm'r of Soc. Sec.*, No. 1:19–cv–576, 2020 WL 5035451, at *7 (S.D. Ohio Aug. 26, 2020) (quoting *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020)).

8

At the outset, the Court notes that an ALJ is not required to recite medical opinions verbatim. *Poe*, 342 F. App'x at 157. Still, an ALJ "must meaningfully explain why certain limitations are not included in the RFC determination—especially when such limitations are set forth in opinions the ALJ weighs favorably." *Howard v. Comm'r of Soc. Sec.*, No. 3:14–CV–364, 2015 WL 8213614, at *4 (S.D. Ohio Dec. 9, 2015), *report and recommendation adopted*, No. 3:14–CV–364, 2016 WL 99114 (S.D. Ohio Jan. 7, 2016). And an ALJ must provide an explanation that allows the Court to meaningfully review the decision. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 5 U.S.C. § 557(c)(3)(A)) (noting that an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'"). "Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his [or her] conclusion.'" *Davis v. Comm'r of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019) (quoting *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020).

When evaluating the opinions of the state agency psychologists, Courtney Zeune, Psy.D., and Karla Delcour, Psy.D., the ALJ determined:

> The mental assessments at the state agency initial and reconsideration level found moderate limitation in the paragraph B criteria (1A, 4A). They found that [Plaintiff] was capable of understanding and remembering shorter repetitive 1–3 step tasks. They found that she could perform short cycle work tasks in a setting with flexible pace and production requirements. They found her capable of interacting superficially with coworkers in a setting with infrequent public contact and of adapting to a routine work setting where changes are infrequent. The reconsideration level affirms the initial residual functional capacity assessment. This opinion evidence is largely persuasive as supported by citations to evidence of record. They are generally consistent with the psychological examiner's objective findings (5F)

9

>and the primary care physician's exam findings. I note that the limitation to "superficial" contact is not supported, however, as evidenced by [Plaintiff]'s ability to work for Door Dash and interact with others via text and in person (5F/4). Instead, [Plaintiff] is capable of frequent interaction with coworkers and supervisors and occasional interaction with the general public. In light of her mental impairments, she has been limited to making simple work–related decisions. She has also been found capable of dealing with occasional changes in a routine work setting explained in advance, with the state agency suggestive "not frequent" instead. The state agency suggested "flexible pace and production requirements" but flexible is not defined nor provides a clear work limit. Instead, [Plaintiff] has been precluded from work that requires satisfaction of production quotas or involves assembly line pace. Considering the combined effect of any breakthrough physical and mental symptoms to the extent supported by the record, [Plaintiff] is expected to be off task 5% of the workday exclusive of normal breaks or lunch period.

(R. at 173).

As Plaintiff identifies, it is unclear from the ALJ's summation how and why he departed from the state agency psychological consultants' opined limitations of "superficial" contact with coworkers and supervisors and "infrequent" contact with the public. (Doc. 8 at 17–20). While the consultants limited Plaintiff to "interact superficially with coworkers in a setting with infrequent public contact" (R. at 260, 272), the ALJ found Plaintiff "capable of frequent interaction with coworkers and supervisors and occasional interaction with the general public." (R. at 173).

In deviating from "superficial" interactions with coworkers and supervisors and prescribing "frequent" interactions "[i]nstead" (*Id.*), the ALJ improperly conflated the frequency of interactions, with how substantive those interactions are. (*Id.*). The dimensions of quality and quantity are not interchangeable. *Corey v. Comm'r of Soc. Sec.*, No. 2:18-CV-1219, 2019 WL 3226945, at *4 (S.D. Ohio July 17, 2019) (holding the ALJ failed to adequately explain their omission of "superficial" contact with coworkers and supervisors when ALJ limited Plaintiff to "frequent" contact instead); *see also Hurley v. Berryhill*, No. 1:17-CV-421-TLS, 2018 WL 4214523, at *4 (N.D. Ind. Sept. 5, 2018) ("'Occasional contact' goes to the quantity of time spent with [ ] individuals, whereas 'superficial contact' goes to the quality of the interactions.") (citation

modified). Replacing "superficial" with "frequent" as the ALJ does here "does not accommodate a limitation relating to the *quality* of the interactions." *Id.* (emphasis in original). Thus, the ALJ erred in finding the consultants' reports "largely persuasive" and then failing to adopt their qualitative limitation with no pertinent explanation. *Id.* ("[R]eversal is warranted because the ALJ assigned significant weight to Dr. Marlow's opinions, but failed to include limitations for 'superficial' interactions.").

Additionally, despite finding the consultants' opinions supported, consistent, and "largely persuasive" (R. at 173), the ALJ found that superficial interaction with coworkers and supervisors was "not supported" by Plaintiff's ability to drive for DoorDash. (*See*, *e.g.*, R. at 173 (citing R. at 188–89)). The Commissioner cites this discussion to emphasize that the limitation was "inconsistent" with DoorDashing. (Doc. 10 at 8 (citing R. at 173)). It is not apparent to the Undersigned how maintaining a job that has no coworkers or supervisors is probative of Plaintiff's ability to interact with coworkers and supervisors. Nor did the ALJ answer this question with explanation or evidence. (R. at 173).

As for interactions with the general public, the ALJ's opinion similarly falls short. The ALJ deviated from the consultants' limitation of "infrequent" interactions with the public, and he assigned "occasional" interactions without explaining the deviation. (*Id.* (citing R. at 260, 272)). Even in other portions of the opinion that discuss Plaintiff's DoorDash job, the ALJ did not provide sufficient explanation. (R. at 164, 170–171, 173 (citing R. at 562–67)). For example, the ALJ claimed Plaintiff's job requires her to "[deal] with customer complaints," but provided no citation to the record. (R. at 171). And the ALJ did not specify how often Plaintiff would be "dealing" with such complaints. (*Id.*). Moreover, the ALJ characterized the nature of Plaintiff's job as "involving interpersonal interaction with a multitude of new people." (*Id.*). But the ALJ did not

11

elaborate. Rather, he acknowledged Plaintiff's subjective reports of "active avoidance of interpersonal relationships," and then concluded that Plaintiff's DoorDashing meant she sought out interpersonal interactions with the public. (R. at 170–71). But Plaintiff's reports do not contain support for the ALJ's assumption. (*See e.g.*, R. at 196 (discussing Plaintiff's interactions with the public, but not how often these interactions occur)). In fact, the record contains contradictions to the ALJ's assumption. In questioning Plaintiff at the Administrative Hearing about how well she gets along with the public, the ALJ himself stated that he would "imagine mostly you put [the food] at the door." (*Id.*). For all these reasons, the ALJ did not provide sufficient explanation for why Plaintiff's DoorDash job demonstrated an ability to engage in "occasional" interactions with the public, as opposed to "infrequent" interactions.

At base, the ALJ's limited explanation for his departure from the consultants' opined limitations—even when viewed in the context of his opinion as a whole—does not build a logical bridge between the evidence and his conclusion. This matter must, therefore, be remanded.

As a final note, Plaintiff also argues that the ALJ failed to properly consider the supportability and consistency factors required by 20 C.F.R. § 404.1520c when evaluating the medical opinion of primary care physician, Seth Vensil, M.D. and urologist, Mitesh Parekh, M.D. (Doc. 8 at 8–17). Because the Undersigned recommends remanding this matter, it is unnecessary to evaluate these alleged errors. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **SUSTAIN** Plaintiff's Statement of Errors (Doc. 8), **REVERSE** the Commissioner of Social Security's nondisability

finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

V.     PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Date: October 1, 2025     *s/ Kimberly A. Jolson*
     KIMBERLY A. JOLSON
     UNITED STATES MAGISTRATE JUDGE